May it please the Court, my name is Darren Miller and I represent the defendant appellant Cody Hopkins. Your Honors, Mr. Hopkins was convicted after trial by jury of attempt enticement of a minor and we are asking that you reverse his conviction and remand for new trial. Unfortunately, Mr. Hopkins' conviction was tainted by prosecutorial misconduct and we have two general categories of misconduct. The first one being that the government improperly attacked Mr. Hopkins' credibility both during its examination and during its closing argument. And the second one being that the government repeatedly misstated elements and its burden during its both its closing and rebuttal closing argument. Counsel, before we get into those, and I would like to go into some depth on those, does the strength of the evidence against Mr. Hopkins make the alleged prosecutorial misconduct irrelevant? In other words, can we excuse an unfair trial if the defendant is likely to be convicted anyway? You could if that were the case, Your Honor, but I would submit that the evidence, this is an issue that involves credibility of Mr. Hopkins and his sole defense rested on his assertion that he had no intent to entice this minor to, or who we thought was a minor, to engage in any sexual activity. His intent was basically to keep her engaged and then to meet her so he could save her. So that's an issue of credibility. That's an issue for the jury. Go ahead. Just I want to follow up on that since we sort of opened the door here, which is, wasn't part of the attack on credibility completely fine and not prosecutorial misconduct? So he had claimed that he had told, I think it was Detective Almeida, that he was sleep-deprived because I think that's sort of the continuing theme. That appears to be false. Detective Almeida said, no, he didn't tell me he was sleep-deprived. I barely said a word to him the entire way over there. So it is true that based on the recording there was a problem. Maybe that was more powerful evidence. But I think it's clear the prosecutor did not commit misconduct in impeaching him on that exact issue based on the Almeida discussion. I think you're correct, Your Honor, technically. Technically that's correct. But if you look at the context of what occurred during the cross-examination, and I think I have it here. Let me see if I can find it. The government asked Mr. Hopkins during its cross-examination, you didn't declare the sleep deprivation to anybody when you were doing your interview, correct? So they were talking about the interrogation at that point. And then Mr. Hopkins replied, I did declare it, but it was not mentioned in the reports. And so then the didn't have it. So understandably, Mr. Hopkins probably, gee, what's going on? I thought I declared it, but it's not in the recording. So he said no. And that kind of went down a whole road where apparently then Mr. Hopkins believed that he told the transporting officers rather than during the interrogation. But this all got started by the government infusing this error in the trial. No, that's fair. I just want to be clear about it because we don't have a fruit of the poisonous tree doctrine when it comes to this type of questioning. And the argument would be not that it's relevant to the error necessarily, whether there was prosecutorial misconduct and the other thing, but I do think it's relevant for the harmlessness of the error. If the credibility is already attacked, then I think we can start looking a little bit more at the overwhelming evidence and everything else to sort of see how much of an impact it had on whether there was a fair trial or not. I'm not sure I totally follow you, Your Honor, but I mean, I think what was going on here is essentially the prosecution was occurring, accusing Mr. Hopkins of perjury and saying, oh, gee, who are you going to believe, that guy or our cop? And so I think that's a very important point. And I think that rests on a story that admittedly is a starting point that's difficult to believe. Counsel, on the sleep deprivation point, don't lose your so, because I'm going to catch up to you. This is reviewed for plain error, right? Yes. That's our position. Okay. Go to your so. Proceed with your so. I kind of lost track of where I was, Your Honor. I know. I apologize. Go ahead, though. But I'm going to clarify its misstatement of the elements. Did the prosecution make further misstatements of the elements? Yes. And if so, when and how many times? And try to be specific. Yes, Your Honor. Immediately after the defense counsel's objection was sustained and just kind of going back, what was sustained was when the government argued basically he's guilty, whether you believe him or not. Even if you buy into this and the court sustained the objection and directed the government to go back to the instructions, which the government did. But then immediately after that, it started back into going off of the instructions and argued he admitted it to you that he wanted to entice a sexually active person and then said either way you look at it, whether he's, and I'm paraphrasing, whether he's there to entice him and wanted to have sex or he enticed her because he wanted to save her, either way he's guilty. And that's just not correct. No objection, though, right? Again, it's plain error. No objection to that. That's why it's plain error. Plain error again. Yes. Right. Proceed. Yes. But so, yeah. So, and there was no curative instruction there either, Your Honors. Even when the objection was sustained, the court did not tell the jury that the misstatements of the elements. Were there any other misstatements, including in the closing arguments? Sure. At least, as I, by my count, three times the government said, argued that Mr. Hopkins confessed or admitted to the elements when he, in fact, did not. What he testified on the stand was that he wanted to entice a sexually active person to meet. The government was required to prove that he was enticing, he had the intent to entice a minor to engage in illegal sex, two totally different things. So three times the government wrongly argued to the jury that Mr. Hopkins confessed. And, you know, even as an attorney looking through these, the law and the instructions, it does get confusing as to what it means to entice and all that. So certainly to a jury, this is going to be very confusing. And after the objection sustained and the government proceeds and neither the court nor defense counsel say anything, that's extremely prejudicial. So after the objection was sustained, did the district court admonish the jury to disregard the government's inaccurate statements? I don't believe so. Did it tell the jury that the law was misstated? I don't believe so, Your Honor. Did the prosecutor read the jury, main jury instruction, we call it director, did the prosecutor read that to the jury after all this other stuff? After the objection, the court directed the prosecutor to read the instruction. Right. And the government did. The government did do that. The government read the instruction to the jury. Yes. The prosecutor read it to the jury. Right. But then immediately after that, it resorted back to, and so it's almost worse than misstating the law. It's basically saying, hey, file the law, but this is what it means, and it means that you believe his defense, convict him. And if you believe he's not, and if you think that is a defense, well, he's not credible because of sleep deprivation issue. So this is kind of a dual attack that was greatly prejudicial to Mr. Hopkins' trial. But there was no problem with the, I know there were problems before and after, but there was no problem with the way it was read, the instruction. In other words, it was an accurate reading of the court's instruction. You don't claim that that instruction was erroneous. That's correct, Your Honor. They got it twice, right? They got it twice. The prosecutor read it to them at that time, and then the judge read it in the instructions. Right. That's correct. They got it twice. That doesn't happen often, does it? Well, I mean, I guess it would happen any time a court directs an attorney to read the instruction. No, I did it. Yeah, I understand your point, Your Honor. I haven't heard of it in 33 years. Yeah. But I'm not the witness here. But you can proceed. Yeah. But our point isn't that the jury wasn't properly instructed. It's that the government was misleading the jury as far as what it had to prove. And then actually after it read the instruction accurately, and so by the way, back to what we were doing wrong before still applies, that makes it extra prejudicial. On the overwhelming evidence point, I know that we've sort of moved on from that, but I want to go back to it, which is this was a very unusual defense. Were you trial counsel below? No, I was not. Okay. Yeah. It's unusual to sort of argue that I'm — because I've read those texts carefully, and they describe a lot of sexual acts. And it's an unusual defense to say, oh, I was doing all that, playing along so that I could save someone. And then you have the guy showing up in like a jacket almost or something with his bare chest showing, which is also not suggestive of somebody trying to save someone. Now, I know that everyone gets a defense, but I wonder if that plays into sort of the overwhelming evidence, that it was kind of a — I don't know, just kind of a strange defense, a hard one to believe. Right. Well, I guess point one would be that that's why the jury should be found in the law all the more, because it's a starting point, it's a difficult defense. And getting back to the bare-chested thing, he was riding a motorcycle. I don't think it's that unusual at all for someone riding a motorcycle to be wearing a leather jacket and have it undone. So I think that was kind of overstated by the government down below. But, yeah, and you could almost say your defense was, oh, my — in the case of my dog ate my homework. Well, you know, most people go, sure, your dog ate the homework. Well, right. But someone's dog actually ate their homework. And at some point, that is a legitimate defense. And that's the purpose of the jury. And so we're not asking for reversal based on sufficiency of evidence. All we're asking for is a new fair trial where the jury can apply the law properly. And do we know that they didn't apply the law properly? No, not 100 percent for sure. But given the quantity of error here, it appears that Mr. Hopkins was denied a fair trial. I believe I'm done with my main argument. Sure. And that's rebuttal time left. Yes. Thank you, Your Honor. Thank you. Mr. Colander. Thank you, Your Honors. May it please the Court, my colleague. I'm Kevin Colander from the U.S. Attorney's Office in South Dakota, and I'm here asking this Court to affirm the convictions. There are two allegations of prosecutorial misconduct here. We agree on the first one that there was error, and it was plain. There was a mistake made, right? No one remembered, including defense counsel, that he had asked for a cup of coffee at the tail end of his interview and said that he was sleep deprived. We agree with the district court that that was a minor, if not minuscule, to borrow the massive amount of evidence here of guilt. Counsel, if a defendant's falsely accused by the prosecutor in front of the jury of committing perjury, why doesn't that impact their right to a fair trial, given that his only defense rested on his credibility? Well. It seems rather to me that it's much more than a mere mistake of fact. It goes to credibility. Of course, the question is whether there's a reasonable chance that this would have occurred here. There certainly could be cases where a false attack on someone's credibility could infect the trial to such a state that someone's due process rights to a fair trial have been violated. But this is certainly not that sort of case. And I certainly find it hard to believe his story, but I'm an appellate judge. I'm not the jury. Why isn't that a matter for the jury to assess the credibility and make that determination? Well, it is. And as Judge Strass pointed out, he did also misstate who he had said this to. So some of the statements, I think the one during closing, were about Officer Almeida, who was a transporting officer. It appears to be a fair attack on his credibility in that circumstance. But I concede that no one remembered this statement, right? So it wasn't that the prosecutor was parsing through and making that distinction, although Officer Almeida had testified. Now, to your question, though, there certainly can be instances where an attack on credibility is so pervasive. This was out of the attacks on credibility in this case. This was a very minor attack on credibility. The real credibility issue was about this defense. And, you know, the defense, I don't need to go through all the explicit language and the text messages, but, look, in these Sting cases, it's not a coincidence that there's often overwhelming evidence, right? The evidence in some ways is orchestrated. And this is right on cue of what you might expect for an enticement, an attempted enticement case. He's the one who contacts the undercover. He's the one who suggests meeting up. He's the one who suggests a hotel. He's the one that there's flirtatious, perhaps, discussion from the undercover officer. He's the one who turns it into explicitly sexual. He's the one talking about, you know, sexual positions and genitalia and number of rounds and et cetera, et cetera. He's the one who proposes then to meet up on the separate app. He's the one who drives to that place. And, yes, he does show up wearing an unbuttoned shirt. The point is it's a strange outfit to be wearing if you're going to, you know, be a lay mentor to a troubled teen. It's a strange place to meet that troubled teen in a dark parking lot of a high school during the summer. There's also some discussion about the fact that he had a campground at Buffalo Gap. Why is that important to a West River jury in South Dakota? This is in the midst of the Sturgis Motorcycle Rally and he has a campground at the place where the biggest party in America is going on right then and there. He says he's using these apps because, you know, it's kind of lonely to be a solo traveler and this is how he meets people. He drives 45 minutes away from the biggest party in America to meet a, what he thought was a 13-year-old in a high school parking lot after discussing, what, getting hotels. It wasn't because he was tired of camping and he packed up his gear. He didn't bring his gear. He left his campsite. What was the hotel for? So that's the credibility problem and it's a pervasive credibility problem throughout this. There really is no reasonable way to look at this and think that this is how a 29-year-old man would act if he thought there was a troubled teen that he needed to help. Roberts, counsel, the test that we follow is, well, one part of it is the cumulative nature of the alleged prosecutorial misconduct here. Do you agree that there's a distinction between enticing a minor to engage in sexual activity on the one hand and enticing a minor to meet or stay in communication on the other? The key thing and why we don't believe there was error, no less plain error, on what was said during the closing about the elements. The difference between those two things? The key difference is this is an attempted enticement case. This is a substantial steps case. And why that's a key difference is this Court has held numerous times that the government does not have the obligation to prove that an individual was actually intending to engage in a sexual act. Right? And so if it was an enticement case or a case that didn't have the attempt element, you know, we might be in a realm, if it was an attempted rape case in State court, we would have to prove that there was an intention to actually engage in sex. But does it have to prove that there was an enticement to engage in sexual activity? I mean, that's the language of the statute. That's right. And it's different than saying, would you meet me, would you stay in communication with me, is it not? That's true. But at the point that you use That's what they were, that's what the jury was told by the prosecution. The jury was also told that the government didn't need to prove that he was intending to engage in a sex act. The point is, is the prosecutor, I believe, was correct when she said this defense is not an actual defense to this crime. Once you have engaged in these discussions, once you've driven to the meat spot, this Court has said in Rehab, in many other cases, that is sufficient for substantial steps to prove attempted enticement of a minor. So why did the district court sustain the objection? Well, because she had said entice, entice, entice, and hadn't finished the end of that sentence. And then she's allowed, and her point in response in the bench conference was, look, I'm making this distinction because we don't want to have to prove that there was an actual person involved, because there wasn't. This was a persona and a sting operation. The law is clear on that also. And then she reads the instruction entirely again and goes back to her point that this supposed defense, which is essentially, I didn't intend to actually have sex with this person, that's not a defense under the law. You know, it dates back to, in the briefing, there's the cases that are cited that say this. There's the Pearson case. But, you know, dates back. The seminal case on this is a Sixth Circuit case from 2000, US v. Bailey. I'll give you the site, 228 F. 3rd, 637, Sixth Circuit, 2000. And what the court there says is that it's not required to prove that an individual intended to actually engage in sex, because when Congress put the attempt element in that enticement statute, it meant that there was a separate intent requirement between the substantive offense and the attempt offense, meaning that as long as you've taken substantial steps to entice a minor, you've completed the offense. On the cumulative error point that Judge Graz was asking about, we have sort of a mixed standard of review. I haven't seen that before, because one of the instances was objected to. I think it was the instruction issue, and the other was not. And so when we're talking about we kind of have like a partial plain error type of issue. Maybe it doesn't matter here, but how would you suggest we approach that when we're talking about accumulating the two errors? Well, I think that the any error that occurred before — well, of course, we don't believe that there was error that occurred in the reciting of the elements. But if the Court disagrees with me, any error that occurred before the curative instruction and the objection that was sustained in the reading of the whole thing has been cured. And so — and by the way, you know, we also cited the case Gallaher is cited here. That's a case directly on point in which this Court found that there was — by the way, it's directly on point in a lot of ways. In one way, it was a Sturgis-Sting case from my office. Right. In that case, the Court found that there was an error in the way that the government talked to the jury about the intent element. It was an entrapment defense, the entrapment element. But then found that because of the overwhelming evidence, you found harmless error. So where I'm going with that is I think the result is the same sort of regardless of the standard of review here. We think it's plain error review. We talked about abusive discretion because there's a bit of confusion, I think, in the briefings about whether we were dealing with an appeal over the motion for a new trial, which would be a different standard of review, or whether this is prosecutorial misconduct. I think the result's the same. But you see the problem here for the earlier error, the misstatement of the coffee and the sleep deprivation, you'd be, I think he has the burden there, whereas the government would have the burden on the misstatement, the alleged misstatement of the instruction. So it does leave us in a weird position. Maybe it only matters if it's 50-50. I don't know. I think the, I think I agree with you on the first half of the alleged misstatement of the instruction. But then there's, so. So we also look to the strength or detail of the curative instructions. And they seem to be much weaker or less detailed than in some of the other cases. Well, the curative instruction essentially here is, folks, you know, the ladies and gentlemen of the jury, the law is what I've read to you, and you should pay attention to the law. There was also a court. There was no admonishment as to the misstatement by the prosecutor. I think that's right. There was no admonishment. And I think in part because the discussion at the bench conference wasn't that the prosecutor had said anything incorrect. It's that she hadn't said the complete element. Right? In fact, I think the Court said, I agree with you, but you haven't said the whole thing. So it really wasn't a matter for admonishment. It was just complete your sentence. And right after that bench conference, the jury instruction was read word for word. Word for word. Right? Yeah. By the prosecutor. By the prosecutor. Not by the judge. Right. By the judge. And, by the way, in the opening, the first closing of the government, the government notes that the jury instructions are up there on the screen while that prosecutor was talking about them. And, of course, we had the general preliminary instruction that the arguments by counsel are not evidence, and the law is the law that's read by the Court. So those are factors that this Court has found in Gallagher and other cases can rehabilitate even a mistaken statement of the law by a prosecutor. You're saying Darden is your closest case? What case did you say was similar? Gallagher is the case. Gallagher with a G? Gallagher. G-O-L-L-I-H-E-R deals with that, but, of course, there's many others. So the evidence here is really overwhelming. And no matter kind of how we slice this, the Court has to get back to this question ultimately of, well, if there were errors, is there a reasonable possibility that the — or reasonable probability that the jury would have decided something different? And I submit that this isn't a close call case in any stretch. On that elements question, though, I also think that there seems to be still kind of a misunderstanding of what the elements of this attempted enticement are. And I just want to reiterate, the government is not required to prove that an individual intended to engage in a sex act. And I think that is what the prosecutor was saying about this supposed defense, which is it's not really a defense to this crime if you say, yeah, I knew that this was a sexually active person, I knew she was 13, I intended to use that sexual discussion in order to have her come meet with me, and I met up with her, right, all the substantial steps to achieve attempt, but I didn't intend to have sex with her. My intentions were different. I think the prosecutor was right that this defense wasn't a real defense. Don't you have to have an intent, though, to do an illegal act of some kind? I think that, and what would be the, the illegal act can't be just meeting up. The illegal act is an enticement using, using the set. It's not entice her to do an illegal act or to do an illegal act with her. It's an, it's enticing her with an illegal sexual activity, which the enticement here was, you know, we're going to engage in sex. Here's the positions, et cetera, et cetera. And I think the case law is clear on that. And by the way, the jury was instructed that, and those jury instructions are not in dispute in this appeal. Counsel, that's a far cry from enticing someone to meet or stay in communication. So I think you're trying to have it both ways. I think they're the, are you referring to things that the prosecutor was saying? They said, yes. I think that's just, the prosecutor was talking about part of the element there. So it's an element of the crime to entice a minor to meet or stay in communication. No. That's what was said. The case law is clear that if you've enticed a minor to meet and then you meet up, that you've achieved a substantial step. Certainly, the rest of the element includes an illegal sexual activity. But, I mean, that's why we say in our brief, look, prosecutors aren't required to recite all of the elements when they're discussing their closing. This is an instance where the prosecutor was talking about part of an element and then was admonished and then read the whole thing, just to be clear. So I'm out of time. Thank you, Your Honors. I very much appreciate your attention to this important case. Thank you. Mr. Miller? Yes, Your Honors. The government argued that the defense is hard to believe. Well, if it was hard to believe, then why didn't it just make that argument? Why didn't it just stick with our argument? They made that argument, too, right? Yeah. That's the theme of the prosecutor. Go ahead. Right. Yeah. Why didn't they just stick with the argument that, hey, his story's not credible? But they didn't. They went and said, well, even if you believe his defense, he's still guilty. So it's somewhat disingenuous now to appear and say, well, it's hard to believe. Well, if it's hard to believe, then just prove it the way it should have been proven. And as far as it being no defense, I'd also like to note that there, I believe, the government, there were pretrial motions in Limney, and it was decided that the entrapment defense couldn't be raised. So if this is no defense, why wasn't that done pretrial and there was no motion to exclude this defense rather than doing it this way and after the fact, after sandbagging the defendant and claiming that it's not a defense? There was no allegation this wasn't defense ever. I'm not sure if I had anything else I wanted to touch upon. No, I guess going to the credibility of Mr. Hopkins, I'd also like to point out that he was initially on an adult social, I don't know if you'd call it dating website, and this fictitious person, Lucy, represented herself to be a 19-year-old, a person of age. So eventually when they were texting. But that was for a very short time, though, right? Well, it was the entire time they were messaging on the app. It was only when they moved to text that Lucy claimed to be underage. But I guess my point is there's no evidence that Mr. Hopkins was out fishing or looking for children to abuse. They searched his phone. There was nothing like child pornography, nothing on his phone to indicate that he's this type of a person that would be abusing minors. And so if this defense was ever to be bought, it would be a person like Mr. Hopkins where there's zero evidence that he had any inclination to be attracted to children, and this just came out. So this, again, this is an issue for the jury to decide properly. Well, they were properly instructed, but a jury that did not, was not impacted by prosecutorial misconduct. And if there are no other questions, I would ask that you reverse and remand for new trial.